780 P.2d 1380
**Bernard P. GESINA,**
**Plaintiff/Appellant,**

**v.**

**GENERAL ELECTRIC COMPANY, a**
**corporation, Defendant/Appellee.**

**No. 2 CA–CV 88–0142.**

Court of Appeals of Arizona,
Division 2, Department A.

Oct. 13, 1988.
Supplemental Opinion on Reconsideration
June 6, 1989.

Review Denied Oct. 31, 1989.

Miller & Pitt, P.C. by Grace McIlvain and Eugene N. Goldsmith, Tucson, for plaintiff/appellant.

Lewis and Roca by John P. Frank and Jon E. Pettibone, Phoenix, for defendant/appellee.

## OPINION

HOWARD, Judge.

### SUBSTANTIVE FACTS

Appellant Bernard Gesina was first employed by General Electric Company in February 1948. He transferred to Tucson to work in General Electric's Apparatus Service Shop on October 29, 1973. At that time, the General Electric facility in Tucson contained two buildings on the same site. One building housed the Apparatus Service Shop and the other building housed the Instrumentation Service Shop. In 1976, Gesina was transferred to the Instrumentation Shop. From mid–1978 until April 1983, both shops conducted their operations in the same building. At all times the two service shops had separate and distinct functions, managerial structures, accounting procedures, profit and loss zones and staffing.

In December 1982, Gesina was laid off from his job in the Instrumentation Service Shop. Prior to his layoff, General Electric had decided to close the Instrumentation Service Shop, and in March 1983 the shop was completely shut down. Gesina subsequently exercised his seniority to return to work for the Apparatus Service Shop in the same building.

General Electric maintains various benefit plans for its employees, including the plan which is at issue here, a pension plan for non-exempt salary employees. In case of a "plant closing" certain benefits are available to otherwise eligible employees in the form of plant closing benefits. General Electric has never established any funds to pay out plant closing benefits and incurs the payment of such benefits as a direct cost.

Among the eligibility requirements for this supplement is that a beneficiary's employment must have been terminated due to a "plant closing." The plan in effect when Gesina was laid off in 1982 defined a plant closing as follows:

"Plant Closing" and "To Close a Plant" mean the announcement and carrying out of a plan to terminate and discontin-

ue all Company operations at any plant, service shop or other facility.

Such terms do not refer to the termination and discontinuance of only part of the Company's operations at any plant, service shop or other facility nor to the termination or discontinuance of all of its former operations coupled with the announced intention to commence there either larger or smaller other operations. Any employees released by such latter changes will be considered as out for lack of work and will be subject to provisions applicable to those on layoff.

General Electric is the administrator or trustee of the plan and has consistently interpreted the plant closing definition as inapplicable to the termination or discontinuance of some but not all operations at a General Electric location, except as dictated by a footnote to the definition which we have not set forth here since it is inapplicable to the present situation.

During the period 1978 through 1985, there have been over 200 instances where some, but not all, General Electric operations have been discontinued at a General Electric facility and none has been treated by the fund administrator as a plant closing. The termination of the Instrumentation Service Shop at the Tucson facility in 1983 was one of those instances.

There is a procedure for applying benefits when there has been a plant closing which Gesina did not follow in this case prior to filing this lawsuit. However, the evidence was that if he had followed this procedure his application for benefits would have been denied since the fund manager did not believe there had been a plant closing.

### PROCEDURAL FACTS

On February 14, 1984, appellant filed a four-count complaint in the Pima County Superior Court. Count One alleged a violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq. and a violation of Arizona's Civil Rights Act, A.R.S. §§ 41–1401 et seq. Count Two alleged wrongful discharge; Count Three alleged breach of an employment contract based on wrongful discharge; and Count Four alleged breach of employment contract by failing to award him alleged pension guarantees.

After the issues were joined, General Electric moved for summary judgment on the contract claim in Count Four. This motion was based on the language of the General Electric plan and general principles of Arizona contract law. Judge Harry Gin of the Pima County Superior Court, denied the motion, concluding that there was an actual dispute as to whether the facility in which Gesina had worked had been closed. The case was then permanently assigned to Judge Robert Buchanan.

New counsel for General Electric subsequently moved for a dismissal of Count Four because it was preempted by the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 et seq. (ERISA). Gesina did not oppose that motion on its merits but, conceding that "the law regarding ERISA ... preemption of state claims for breach of contract has evolved to the point of precluding such claims", then amended his complaint to delete the state law contract claim and add new Counts Four and Five alleging violation of ERISA. Count Four alleged that Gesina's layoff violated 29 U.S.C. § 1140 and resulted in a loss of pension benefits. Count Five incorporated Count Four by reference and again alleged violation of 29 U.S.C. § 1140 and further alleged fiduciary violations of 29 U.S.C. §§ 1103(c)(1) and 1104.

General Electric moved for summary judgment on these new counts on the grounds, inter alia, that there had been no "plant closing" under General Electric's interpretation of the plan's definition and that ERISA required deference to that interpretation. After additional discovery, the court granted the motion.

There are four issues which determine the outcome of this appeal. Was the motion for summary judgment an improper horizontal appeal? What is the standard of review under ERISA of a fund administrator's decision? Did the trial court err in deferring to the decision of the fund admin-

istrator? Did the superior court have jurisdiction to decide Count Five, a claim for breach of trust under ERISA?

## STANDARD OF REVIEW AND JURISDICTION

When reviewing a grant of summary judgment, the court of appeals must, after examining the entire record, determine that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. *Nicoletti v. Westcor, Inc.*, 131 Ariz. 140, 639 P.2d 330 (1982).

ERISA comprehensively regulates the entire field of employee benefits and supersedes all state law relating to employee benefits. See 29 U.S.C. § 1144; *Pilot Life Ins. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). The federal district courts have exclusive jurisdiction over any action under ERISA brought by a plan participant or beneficiary, except that state courts have concurrent jurisdiction over actions to recover benefits or otherwise enforce rights under plan terms. 29 U.S.C. § 1132(e).

Accordingly, the court lacked jurisdiction to address Gesina's claim in Count Five that General Electric breached ERISA fiduciary duties and laid him off in violation of ERISA. See, e.g., *Central States and Southeast and Southwest Areas Health and Welfare Fund v. Old Security Life Insurance Co.*, 600 F.2d 671 (7th Cir. 1979); *Lembo v. Texaco, Inc.*, 194 Cal. App.3d 531, 239 Cal.Rptr. 596 (1987). Count Five is dismissed.

## REVIEW OF A FUND ADMINISTRATOR'S DECISION UNDER ERISA

In *Van Boxel v. Journal Co. Employees' Pension Trust*, 836 F.2d 1048, 1049 (7th Cir.1987), Judge Posner noted that "the black-letter rule is a decision by a pension trust to deny benefits to an individual claimant can be set aside in a suit under ERISA only if the decision is 'arbitrary and capricious.'" Judge Posner also noted that there has been a growing skepticism about this approach which in the Third Circuit culminated in the case of *Bruch v. Firestone Tire Co.*, 828 F.2d 134 (3rd Cir.1987), cert. granted, *Firestone Tire and Rubber Co. v. Bruch*, 485 U.S. 986, 108 S.Ct. 1288, 99 L.Ed.2d 498 (1988), holding that whenever someone who is not a plan beneficiary is in a position to benefit from the rejection of a claim—the company, for example—no deference should be given the trustee's decision and the case should be treated as an ordinary contract dispute between the claimant and the trust. It is this *Bruch* approach which the appellant urges us to adopt here. We decline to do so. The *Bruch* case stands alone and has not been followed by another federal circuit court. Judge Posner rejected the *Bruch* approach in *Van Boxel.* After a scholarly analysis Judge Posner decided that the arbitrary and capricious standard should be retained and has within it a certain flexibility which allows a court to take into consideration the bias of the trustee when applying the standard:

> Flexibly interpreted, the arbitrary and capricious standard, though infelicitously—perhaps even misleadingly—worded, allows the reviewing court to make the necessary adjustments for possible bias in the trustees' decision. So there is no urgent need to throw it overboard and cast about for an alternative verbalization. Where ... the claimant does not argue or is unable to show that the trustees had a significant conflict of interest, we reverse the denial of benefits only if the denial is completely unreasonable. The greater the conflict of interest of a majority of the trustees, the less we defer to a denial of benefits that appears to be wrong.

836 F.2d at 1053.

In *Van Boxel,* Judge Posner found that the trustees had a conflict of interest which required the court to carefully scrutinize the trustees' action to make sure that it was reasonable under the arbitrary and capricious standard. This seems to be the approach taken by our own federal circuit

in *Fielding v. International Harvester Co.*, 815 F.2d 1254, 1256 (9th Cir.1987):

An ERISA plan administrator's decisions are to be sustained unless "arbitrary or capricious." *Smith v. CMTA–IAM Pension Trust*, 654 F.2d 650, 654 (9th Cir. 1981). ERISA trustees have "wide discretion 'short of plainly unjust measures' to decide questions of eligibility." *Hancock v. Montgomery Ward Trust*, 787 F.2d 1302, 1308 (9th Cir.1986). Any "reasonable" interpretation of the plan terms should be upheld. *Id.*

To some extent this degree of deference derives from trust law rules reflecting the presupposition that trustees have no pecuniary interest in their own decisions. In many ERISA cases, however, as here, the employer administers its own plan and, in one fashion or another, may be affected financially by its decisions. As we have previously held, in such circumstances "[l]ess deference should be given to the trustee's decision." *Jung v. FMC Corp.*, 755 F.2d 708, 712 (9th Cir.1985). *Nonetheless, we preserve the "arbitrary and capricious" vocabulary in these cases. And even in Jung-like situations, our review remains deferential. Provided that the plan terms at issue are ambiguous, we will uphold the employer's interpretation so long as it is reasonable and made in good faith. See id.* at 713.

(Emphasis supplied).

The trustee here, General Electric, had a conflict of interest since any benefits payable to appellant came out of its own pockets. The closing of the Instrumentation Service Shop at the Tucson plant was not a "plant closing" since only part of the operation at the plant was discontinued. Therefore, the decision of the fund administrator to deny benefits in such circumstances was reasonable. Even if the terms of the plan were considered to be ambiguous, there being no showing of bad faith on the part of the trustee, the trustee's decision to deny benefits was reasonable.[1]

Appellee's request for attorney's fees pursuant to 29 U.S.C. § 1132(g)(1) for a frivolous appeal is denied.

AFFIRMED.

LIVERMORE, P.J., concurs.

HATHAWAY, Judge, dissenting.

There is no dispute that the instrumentation service shop closed. There is no need for interpretation. The plant closing benefits, as defined by G.E.'s own terms, clearly and unambiguously, stated that an "announcement and carrying out of a plan to terminate and discontinue all Company operations at any ... *service shop* ..." (Emphasis added) was an entitlement to appellant when he was laid off in 1982. Appellant was working in the instrumentation service shop when it ceased operations in Tucson. There is no showing that only part of the instrumentation shop ceased operation. By its own definition, the closure of the instrumentation service shop in Tucson at the time Gesina was laid off was a plant closing. Therefore, if anything, I believe the undisputed facts support summary judgment for appellant. I would reverse.

## SUPPLEMENTAL OPINION ON RECONSIDERATION

HOWARD, Judge.

On October 13, 1988, we filed an opinion in this case affirming the trial court. Appellant petitioned the Arizona Supreme Court for review, which remanded the case to us, asking that we reconsider our opinion in view of a decision of the United States Supreme Court decided subsequent to our opinion, *Firestone Tire and Rubber Company v. Bruch*, —— U.S. ——, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), in which the court held that the standard of judicial review of actions under the Employee Retirement Income Security Act (ERISA) was a de novo standard unless the benefit plan gave the administrator or fiduciary discretionary authority to determine eligibility

---

1. From 1978 through 1985, the Tucson facility was one of over 20 General Electric facilities at which one or more operations had been discontinued while at least one other operation remained. None of these instances was treated by the trustee as a plant closing.

for benefits or to construe the terms of the plan.

When the case was remanded to us we asked the parties to file supplemental briefs and we also had the benefit of oral argument. When the supplemental briefs were filed we discovered that the facts we recited in the original opinion were incorrect because the parties erroneously characterized them to us and did not place before us the documents which they have since attached to their supplemental briefs. Specifically, it was made to appear to us that there was one, single General Electric Pension Plan which contained provisions for job and income security. In fact, there are two separate and distinct plans. There is a "General Electric Pension Plan" and a "General Electric Job and Income Security Plan." The pension plan is an "employee pension benefit plan" under 29 U.S.C. § 1002(2) and the job and income security plan is an "employee welfare benefit plan" under 29 U.S.C. § 1002(1). *Holland v. Burlington Industries, Inc.*, 772 F.2d 1140 (1985), cert. denied *Slack v. Burlington Industries*, 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986).

The pension plan has only two paragraphs dealing with a plant closing. Section XII(7) states:

A former employee whose service with the Company is terminated because of a plant closing after attaining age 50 and completion of 25 or more years of pension qualification service shall be eligible for the supplemental payment provided by paragraph 3. of Section VI. Such supplemental benefits shall be based on the employee's pension qualification service and the terms of the Plan in effect on such date of termination.

Section XXVI(29) defines "plant closing" and "to close a plant" in the language which we set forth in our original opinion, to-wit:

"Plant Closing" and "To Close a Plant" mean the announcement and carrying out of a plan to terminate and discontinue all Company operations at any plant, service shop or other facility.

Such terms do not refer to the termination and discontinuance of only part of the Company's operations at any plant, service shop or other facility nor to the termination or discontinuance of all of its former operations coupled with the announced intention to commence there either larger or smaller other operations. Any employees released by such latter changes will be considered as out for lack of work and will be subject to provisions applicable to those on layoff.

The pension plan contains this important provision in Section XX(6):

Any determination, decision or action of any Named Fiduciary or other entity having powers, duties, obligations and responsibilities with respect to the Plan concerning or with respect to any question arising out of or in connection with the construction, interpretation, administration and application of the Plan and of its rules and regulations, shall lie within the *absolute discretion* of such Named Fiduciary or other entity and shall be *final*, conclusive *and binding* upon all participating employees and any and all persons claiming under or through any participating employees.

(Emphasis added.)

■ As for any employee benefits under the pension plan, since General Electric, as trustee, has the discretion to determine eligibility for benefits and construe the terms of trust, the "arbitrary and capricious standard" of review can be applied and we adhere to the holding of our original opinion.

■ We first deal with the contention made by General Electric that payments under the job and income security plan are "supplemental payments" under the pension plan, paragraph XX(5)(b) which gives the pension board the power to authorize the payment of "supplemental payments ... as are provided by the Plan." We do not agree. This provision refers to the payments which are contained in Section VI of the pension plan entitled "Supplemental Payments" and not to the payments made under the job and income security plan.

■ Unlike the provisions of the pension plan, there is no provision in the job and income security plan which gives General Electric discretion to construe the terms of the plan or determine eligibility. General Electric contends a summary of its plans gives it the necessary discretion and it should be read in conjunction with the job and security plan. We do not agree with this argument. The summary cannot add a provision to the plan. The summary is simply that, a summary. Thus no deference is given to General Electric's interpretation and the plan is to be construed like any other contract. See *Firestone Tire and Rubber Company, supra.*

■ The construction of a contract is a question of law for the court. *Maganas v. Northroup*, 135 Ariz. 573, 663 P.2d 565 (1983). Gesina contends the provision of the job and income security plan defining a "plant closing" unambiguously states that the discontinuance of a service shop constitutes a "plant closing."

General Electric contends Gesina ignores the second paragraph of the provision which is applicable to the situation here since only part of the facility was discontinued.

■ A contract must be construed so that every part is given effect. *Phillips v. Flowing Wells Unified School Dist. No., 8 of Pima County*, 137 Ariz. 192, 669 P.2d 969 (App.1983). Each section of an agreement must be read in relation to each other to bring harmony, if possible, between all parts of the writing. *Brisco v. Meritplan Ins. Co.*, 132 Ariz. 72, 643 P.2d 1042 (App. 1982).

■ In interpreting a contract the court must apply a standard of reasonableness in interpreting the contract language. See E. Farnsworth, *Contracts*, § 7.10 at 492 (1982). We start by examining the contents of the job and income security plan.

■ The plan provides for payments to employees under two circumstances—when there is a plant closing and when there is no plant closing but instead, a layoff. When there is a plant closing an employee gets three choices as to how he will receive plant closing benefits. He can choose to receive severance pay in a lump sum, he can choose to receive periodic payments of the severance benefits or he can choose to be placed on a lack-of-work-status and be paid the benefits which are received by employees who are laid off. If there is a plant closing the employee is entitled to job placement assistance and education and retraining assistance. Under the job placement assistance the employee will receive job counseling which includes counseling and job search, interviewing techniques, identification and assessment of skills, and employment application resume preparation as well as information on placement opportunities. The education and training assistance requires the company to pay an employee up to a maximum of $1,800 for tuition and registration, compulsory fees, books and other supplies required by a course approved by the company which enhances the employee's ability to obtain other employment.

If the employee is laid off, he is entitled to periodic payments based upon his continuous years of service and his weekly pay. The laid-off employee is entitled to this payment as long as he is unemployed, up to a maximum period of one year. An employee who has been laid off is not entitled to the job placement assistance or education and retraining assistance which is received by employees who are unemployed as a result of a plant closing.

As can be seen, employees who are laid off are treated differently from employees who are unemployed because of a plant closing. The obvious reason for this distinction is the finality of a plant closing— the loss of any opportunity to become reemployed by General Electric because of the closure.[1] When operations are still going on there is an opportunity of rehiring in another position or the exercise of seniority, as Gesina did here, to secure a job in one of the still existing operations. One

---

1. Under the plan if there is a "plant closing" an employee with fifteen or more years of continuous service is eligible for a lump sum severance pay computed on the basis of two weeks pay for each of his full years of continuous service plus one-half of a week's pay for each additional three months of continuous service at the time of termination.

must not lose sight of the 'fact that the contract is attempting to define the phrase "plant closing"—a phrase which imports a certain finality—the cessation of all operations. We believe that the only reasonable interpretation is that the discontinuance of a shop results in a "plant closing" only when the shop is a distinct unit and not part of a plant or other facility. Our construction is buttressed by that part of the provision which states that "plant closing" or "to close a plant" does not refer to "... the termination or discontinuance of all of its former operations coupled with the announced intention to commence there either larger or smaller other operations." Thus, if the service shop is closed and a plant commenced, there is no plant closing, a result inconsonant with the position that anytime a service shop closes, there is a "plant closing" even if other operations are still continuing. General Electric did not breach its contract by refusing to pay Gesina a severance payment under the job and income security plan.

Affirmed.

LIVERMORE, P.J., and HATHAWAY, J., concur.